# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

---

RENEE D.[1],

                                           Plaintiff,

            v.                                           3:17-CV-529 (ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                           Defendant.

---

PETER A. GORTON, ESQ., for Plaintiff
LAUREN E. MYERS, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## MEMORANDUM-DECISION and ORDER

This matter was referred to me, for all proceedings and entry of a final judgment,

pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in

accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y.

Local Rule 73.1 and the consent of the parties. (Dkt. Nos. 4, 8).

# I.    PROCEDURAL HISTORY

Plaintiff protectively filed[2] applications for Disability Income Benefits ("DIB")

---

[1] In accordance with recent guidance from the Committee on Court Administration and Case Management of the Judicial Conference of the United States, which was adopted by the Northern District of New York in June 2018 in order to better protect personal and medical information of non-governmental parties, this Memorandum-Decision and Order will identify the plaintiff using only her first name and last initial.

[2] When used in conjunction with an "application" for benefits, the term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits. *See* 20 C.F.R. §§ 404.630, 416.340. There are various requirements for this written statement. *Id.* If a proper statement is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a later date.

and Supplemental Security Income ("SSI") on November 22, 2013, alleging disability beginning September 10, 2012, based upon bipolar, anxiety, and attention deficit hyperactive ("ADHD") disorders. (Administrative Transcript ("T") at 91, 101, 220-26, 227-31). Her applications were denied initially on February 20, 2014. (T. 113-17, 118-22). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held on September 16, 2015. (T. 61-90). A supplemental hearing was held on January 20, 2016, to allow for vocational expert ("VE") testimony. (T. 35-57). On February 17, 2016, ALJ Marie Greener found plaintiff was not disabled. (T. 14-26). The ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on April 19, 2017. (T. 1-6).

## II.    GENERALLY APPLICABLE LAW

### A.    Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

2

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner ] will consider him disabled without considering vocational factors such as age, education, and work experience . . . .  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920.  The plaintiff has the burden of establishing disability at the first four steps.  However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step.  *Id.*

### B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision.  *Selian v. Astrue*, 708 F.3d at 417; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012).  It must be "more

than a scintilla" of evidence scattered throughout the administrative record. *Id.*
However, this standard is a very deferential standard of review " – even more so than
the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial
evidence, a reviewing court considers the whole record, examining the evidence from
both sides, because an analysis of the substantiality of the evidence must also include
that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859
F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its
interpretation of the administrative record for that of the Commissioner, if the record
contains substantial support for the ALJ's decision. *Id*. *See also Rutherford v.
Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence
in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles
v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ
explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ
cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz
v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No.
09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III.   FACTS

Plaintiff was 45 years old at the time of the September 16, 2015 hearing. (T. 66).
She graduated from high school and obtained "medical office" training after graduation.
(T. 67). Plaintiff testified that she needed a great deal of tutoring in order to get

through school. (T. 67).  Plaintiff testified that her disability began in September of 2012, and that she worked briefly for a construction firm after her onset date. (T. 68). Plaintiff stated that her twin sister, who is an accountant, helped her get the job as "a favor." (*Id.*)  However, plaintiff was unable to continue to work for the company because she could not take the stress of answering the telephone and of completing tasks such as filing and copying. (*Id.*)  She testified that the office was "fast-paced," and that taking messages was very difficult for her. (*Id.*)

Plaintiff discussed other full-time work that she had done in the past, including a full time job working as a "night office clerk" for Prestige Delivery. (T. 69).  Plaintiff stated that the work for Prestige involved answering telephones, but she was able to work by herself, and the work was very basic. (*Id.*)  Plaintiff stated that, because of the complications with her disorders, she would not be able to do the job at the present. (*Id.*)  Plaintiff lost the Prestige job because the company was downsizing. (*Id.*)

Plaintiff also worked for the Salvation Army, where her job involved putting clothes away. (*Id.*)  Plaintiff testified that she lost the Salvation Army job due to conflicts and "not being able to work well with others." (*Id.*)  Plaintiff testified that she currently treated with Dr. Suresh Undavia, M.D. and Dr. Jeffrey D. Cole, Pd.D. for her mental impairments. (T. 70). Plaintiff testified that she saw Dr. Undavia once every three months and Dr. Cole twice per month. (*Id.*)  Plaintiff also testified that she had Graves Disease,[3] which involves difficulty with her thyroid. (T. 71).  She stated that the

---

[3] Graves Disease is an immune system disorder, resulting in overproduction of thyroid hormones. https://www.mayoclinic.org/diseases-conditions/graves-disease/symptoms-causes/ syc-20356240.  Common signs and symptoms of Graves Disease are anxiety and irritability; tremor; heat sensitivity; weight loss; enlargement of thyroid gland; change in menstrual cycle; bulging eyes;

combination of these impairments was causing plaintiff to sleep for two or three days in a row, and making it difficult for her to get out of bed. (*Id.*)  Plaintiff stated that Dr. Cole was doing "behavioral therapy" with plaintiff, bringing out the "emotional stuff" that she had not dealt with in years. (*Id.*)  Plaintiff also testified that she could not stand for "any . . . length of time" due to an old knee injury, for which she was taking Tramadol. (T. 72). Plaintiff was taking Adderal and Abilify for her mental impairments, and Levothiroxine for her thyroid condition. (*Id.*)  Plaintiff was also taking Gabapentin. (T. 73).

Plaintiff discussed the problems with her knee and stated that her treatment was "ongoing." (T. 74).  Her knee felt worse when she used it a lot or was on her feet for any length of time.  (*Id.*)  Plaintiff's treatment included cortisone injections in her knee. (T. 75).  Two or three times per week, plaintiff took care of her niece's two-year-old child. (T. 76).  Plaintiff cared for the child for two or three hours at a time, during which time, she took him to the park. (*Id.*)  Plaintiff questioned whether she would be able to take care of the child in the winter because she was worried that he would touch her things if she had to care for him in her home.   Plaintiff told the ALJ that she had severe anxiety and obsessive compulsive disorder. (*Id.*)

Plaintiff also told the ALJ that she visited her mother twice per week, but that it would take her hours to get ready to go to her mother's house, because she was obsessing about her appearance. (T. 77).  Plaintiff stated that her mother was retired, and plaintiff was trying to help her because "she's helping me." (*Id.*)  However,

---

fatigue; erectile dysfunction or reduced libido; frequent bowel movements; thickening and reddening of the skin on the shins or tops of the feet; and rapid or irregular heartbeat. *Id.*

plaintiff was concerned about being such a burden on her family, and this concern was "taking its toll" on plaintiff. (*Id.*)  Plaintiff stated that she was different than her other two sisters, one of which was her identical twin.  Her parents were successful, her father worked for the government, and her mother was a "career woman" her whole life.  Instead, plaintiff got "40's and 50's all through highschool," and she did not know how she managed to graduate. (*Id.*)  However, she testified that the medicine she took helped her "through certain tasks definitely." (*Id.*)

Plaintiff testified that she had a "couple" of girlfriends that she had known since she was thirteen and who understood her "situation. (T. 78).  Plaintiff stated that she and her friends spoke on the telephone, and that plaintiff watched a lot of television and cleaned, but some days plaintiff would just stay in bed. (*Id.*)  Plaintiff could shop for groceries, but testified that she had poor eating habits, and that some days, she hardly ate at all. (T. 78-79).  Plaintiff stated that she could not follow a recipe. (T. 79). Plaintiff testified that she got money from Public Assistance, and that her mother gave her money each month. (T. 78)

Plaintiff stated that driving made her anxious, and that she only drove to her mother's house which was half a mile from hers. (T. 79).  Plaintiff surmised that her anxiety about driving stemmed from a severe car accident, which resulted in scars to her face. (T. 80).  She also had trouble driving if the weather was bad, but she was "trying to get over that." (*Id.*)

Plaintiff testified that she did have a "cleaning business," but stated that she only cleaned for a couple of her mother's friends, and that it was never really "a business."

(T. 80).  Plaintiff's mother was just trying to "help [plaintiff] out." (*Id.*)  Plaintiff stated that helping her was a financial burden on her mother because one of plaintiff's sisters had "terminal cancer," and "they" were helping her out financially. (*Id.*)  In addition, plaintiff stated that her duties did not really involve "cleaning houses," she was just helping "them" out with "odds and ends." (T. 81).  Plaintiff stated that she used to work side-by-side with her mother, but that she missed work when she had trouble getting up. (T. 81-82).  However, plaintiff stated that if she did not have this "problem with the whole sleeping and stuff," a house cleaning job would be her "dream job," because she could work by herself. (T. 81).

Plaintiff testified that when she sleeps, she sleeps so soundly that her boyfriends have commented how difficult it is to get her up. (T. 82).  Plaintiff stated that she does not answer the telephone when she is sleeping, which causes her sister to go to plaintiff's apartment to check up on her. (T. 82).  Plaintiff testified that every two weeks, she would sleep for three or four days. (T. 83).  Counsel appeared to correct her, and plaintiff agreed that she would only sleep for two or three days, and then she would be "up" for ten days in a row. (*Id.*)  Plaintiff testified that this would be her "maniac stage," and during these periods, she would pick at her fingers and "pop" her hair out. (T. 84).  She also stated that she cut her hair completely off, and she would "do crazy things like that," but did not know why. (*Id.*)  Plaintiff stated that during those manic moments, she would be very aggressive, and that she lost her Salvation Army job because she insulted the manager's husband. (T. 84-85).  She also testified that, during a manic phase, she had trouble concentrating on, and finishing, one task. (T. 85).

Plaintiff also testified that she talked to herself, but did not realize that she was doing it. (T. 86).

Plaintiff also discussed her OCD. (*Id.*)  Plaintiff stated that everything had to be in "threes," and she had to go back three times to check everything in her apartment if she was leaving.  Plaintiff stated that her OCD had gotten worse over the years, and that "when the baby comes over, I'm right behind him with the Windex."  It is difficult for plaintiff to live with anyone. (*Id.*)  Plaintiff stated that she was working on this problem with her psychiatrist.  She stated that she no longer wished to be alone. (T. 87). Plaintiff stated that when she worked at Prestige, no one was allowed to touch her desk. Her boss at Prestige was such a nice person, and he understood that she had "little issues," but that she did "work well." (*Id.*)  Plaintiff testified that she did well "with notes," and that she lived by her lists every day. (*Id.*)

Counsel asked plaintiff to estimate how much work she would "miss" in "a job like that." (*Id.*)  Plaintiff testified that she did not know, but with some prompting from counsel, plaintiff first stated that she did not see herself working full time, and then she stated that she would miss "a couple of days a week." (T. 88).

On January 20, 2016, the ALJ took the testimony of VE Joseph Atkinson, who listened to some further testimony by plaintiff, during which she discussed her previous work for the Salvation Army and Prestige - her duties, her hours, and her rate of pay. (T. 37-42).  Plaintiff explained how she worked with her mother in the house cleaning service. (T. 41).  Plaintiff stated that he mother was retired from IBM, and she did house cleaning on the side, "until she couldn't." (*Id.*)  Plaintiff stated that she got to the

point that she could not "follow through" with her mother, and that the "business" was "just a couple of clients," so that currently, plaintiff was only helping her mother around the house in return for her financial support. (*Id.*) Plaintiff testified that she worked for short periods of time, and then left due to stress and anxiety. (T. 44-45). Plaintiff also testified that she worked in a hair salon for a short time, helping with "shampoos and stuff," but it got to the point where plaintiff could not do "certain things without a license." (T. 47).

The ALJ then questioned the VE by proposing a hypothetical question which included the plaintiff's RFC as determined by the ALJ. (T. 50-54). The VE testified that with plaintiff's limitations (T. 51-52), she could not perform any of her previous work, but that there were other jobs, existing in significant numbers in the national economy that plaintiff's could perform. (T. 52-54). The first occupation was "laundry worker II." (T. 52). The second occupation was a food service worker at a hospital. (T. 52-53). The third occupation was a kitchen helper. (T. 52-53). The ALJ then included additional limitations to the hypothetical question, and the VE testified that the jobs that he mentioned were still available to plaintiff. (T. 53).

Plaintiff's counsel asked the VE whether plaintiff could still do the above jobs if she were to be "off task" for more than 10% of the day or if she would be absent more than one day per month. (T. 54-55). The VE testified that, with the "off task" and absenteeism limitation, plaintiff could not perform any work in the national economy. (T. 56). The ALJ's decision and the parties' pleadings provide a detailed statement of the medical evidence of record. (T. 14-26). Rather than reciting this evidence at the

outset, the court will discuss the relevant details below, as necessary to address the issues raised by plaintiff.

## IV.    **THE ALJ'S DECISION**

The ALJ first found that plaintiff had not engaged in substantial gainful activity since her alleged onset date of September 10, 2012. (T. 16).  Even though plaintiff had worked briefly after the alleged onset date, the ALJ found that the work did not rise to the level of substantial gainful activity ("SGA"). (*Id.*)  The ALJ also mentioned that plaintiff had received unemployment benefits during the period after the alleged onset of her disability, but the receipt of such benefits was "only one of the many factors that must be considered in determining whether the [plaintiff] is disabled." (T. 16-17).

Next at step two of the sequential analysis, the ALJ found that plaintiff had the following severe impairments: right knee arthritis, Attention Deficit Disorder ("ADD"), Anxiety Disorder, OCD, and Personality Disorder. (T. 17).  The ALJ noted that, during any given encounter, mental health professionals gave plaintiff various diagnoses and characterized her impairments in various ways.[4]  However, the name of the impairment was "of no real consequence."  Rather, the critical inquiry was the impairment's affect on plaintiff's mental functioning.  Thus, regardless of the label placed on plaintiff's impairments by the various mental health professionals, the ALJ considered "all the symptoms affecting the [plaintiff's] mental functioning, the "impact of the disease," and the limitations that the impairment imposed upon plaintiff's ability to perform basic

---

[4] These "diagnoses" included ADD, ADHD, bipolar disorder, anxiety disorder, generalized anxiety disorder with OCD, OCD, personality disorder, paranoid, borderline personality disorder, cannabis abuse by history, mood disorder, and amphetamine or amphetamine-like induced mood disorder. (T. 17).

work functions. (*Id.*)

The ALJ also noted that plaintiff suffered from an additional impairment that was not severe. (*Id.*)  While there was evidence in the record that plaintiff had issues with her thyroid, the ALJ found that this condition would have "no more than a minimal effect on the [plaintiff's] ability to perform work." (*Id.*)

The ALJ also found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a Listed Impairment at step three of the sequential analysis. (*Id.*)  In making this decision, the ALJ considered Listings 1.02 (Major Disfunction of a Joint); 12.04 (Affective Disorders); 12.06 (Anxiety Related Disorders); and 12.08 (Personality Disorders). (T. 18-20).  At the end of her Listing analysis, the ALJ noted that the limitations discussed for steps 2 and 3 of the sequential evaluation were not an RFC assessment because the mental RFC used at steps 4 and 5 of the sequential evaluation required a more detailed assessment. (T. 20).

At step 4 of the analysis, the ALJ found that plaintiff had the physical RFC to perform medium work, but was limited by her mental disorders to work which did not require more than "simple, short interactions" with supervisors, co-workers, or the public. (T. 20).  Although plaintiff could work "in proximity with others," her tasks may not require working "in conjunction" with others and must predominantly involve working with objects rather than people. (*Id.*)  Plaintiff was also limited to "no more than simple decision-making and routine daily tasks and duties."  These duties must be performed in the same workplace and would not "significantly change in pace, schedule, or location on a daily basis." (*Id.*)

In making this determination, the ALJ stated that she considered all plaintiff's symptoms and the extent that plaintiff's symptoms were consistent with the objective evidence and other evidence, including opinion evidence. (*Id.*)  The ALJ also considered, plaintiff's credibility. (T. 21).  The ALJ found that the plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that plaintiff's statements regarding the "intensity, persistence, and limiting effects" of her alleged symptoms were "not fully credible to the extent that her statements are unsupported by competent medical evidence and opinion and contradicted by other evidence." (*Id.*)

The ALJ noted that plaintiff admitted to a pattern of lying and stealing.  Plaintiff also told a medical provider that her "felony" was a barrier to employment. (*Id.*)  The ALJ also found that if plaintiff's symptoms were as severe as alleged, she would be more compliant with treatment recommendations as evidenced by her treating psychiatrist. (T. 21).  The ALJ cited plaintiff's treating psychiatrist, who noted plaintiff's "lack of cooperation with therapy," her desire for medication, and her need to "grow up." (T. 21-22).

The ALJ also considered the medical evidence as a whole, discussing plaintiff's physical and mental impairments and the medical providers who treated her. (T. 22-24). The ALJ discussed the records, written by Dr. Undavia and Dr. Cole, assigning them relative weight. (*Id.*)  The ALJ accepted portions of the medical opinions, while rejecting others, based upon their internal consistency and their consistency with the rest of the medical evidence. (*Id.*)  Although the ALJ gave Dr. Undavia's opinions

"significant weight," the ALJ rejected Dr. Undavia's opinion that plaintiff had an "extreme" limitation in dealing with the general public, based upon her varied activities of daily living. (T. 22).

The ALJ noted the Dr. Cole submitted various statements, "wherein he appears to advocate for whatever the [plaintiff] requests." (T. 22).  The ALJ gave Dr. Cole's opinions "some weight," but noted that there were internal inconsistencies in his reports. (*Id.*)  The ALJ accounted for plaintiff's limitations by restricting her to simple tasks, low contact work, and low stress routines. (T. 23).  The ALJ also considered the report of non-examining agency psychiatrist, Dr. Kleinerman. (T. 23).  The ALJ gave Dr. Kleinerman's report "partial weight," to the extent that his findings were supported by the other medical evidence of record. (*Id.*)  The ALJ also gave no weight to the a Global Assessment of Functioning ("GAF") score that was in the record because such scores are not standardized, and there was no supporting detail necessary to determine which areas were being considered when the overall rating was made.[5] (*Id.*)  The ALJ gave third-party family statements no weight because of their "inherent bias." (T. 24).

After considering the evidence and plaintiff's RFC, which included all plaintiff's mental limitations, the ALJ found at step 4, that plaintiff could not perform any of her

---

[5] The GAF is a 100 point scale.  A score of 41-50 indicates "serious symptoms," 51-60 indicates "moderate symptoms," 61-70 indicates "some mild symptoms," and 71-80 indicates that if symptoms are present, they are "transient" and "expectable reactions to psycho-social stressors," resulting in "no more than a slight impairment in social, occupational, or school functioning." AMERICAN PSYCHIATRIC ASSN., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32-34 (4th Ed. Text Revision 2000) ("DSM-IV-TR").  The GAF is no longer included in the most recent edition of the DSM, and it does not have direct correlation to the severity requirements for a finding of disability. (*See* T. 24) (ALJ notes that the GAF scores are not standardized or based on normative date, and are not good predictors of function.)

past relevant work. (T. 24). The ALJ then turned to step 5 of the sequential analysis. Based upon plaintiff's RFC, the VE's testimony, and the Medical-Vocational Guidelines,[6] the ALJ found that plaintiff could perform other work, existing in significant numbers in the national economy. (T. 24-25).

## V.    **ISSUES IN CONTENTION**

Plaintiff raises the following arguments:

1.    The ALJ erred in failing to find that plaintiff's ability to work consistently was diminished. (Pl.'s Br. at 11-13) (Dkt. No. 9).

2.    The ALJ failed to give proper weight to the medical opinions of record. (Pl.'s Br. at 13-22).

3.    The ALJ erred in determining that plaintiff's thyroid condition was not a severe impairment. (Pl.'s Br. at 22-25).

4.    The ALJ's step five determination was not supported by substantial evidence. (Pl.'s Br. at 25).

Defendant argues that the Commissioner's determination was supported by substantial evidence and should be affirmed. (Def.'s Br. at 3-19) (Dkt. No. 14). Plaintiff filed a reply brief, addressing some of the defendant's arguments. (Dkt. No. 17). For the reasons stated below, the court concludes that the Commissioner's decision is supported by substantial evidence and will dismiss the complaint.

---

[6] The ALJ consulted the Medical Vocational Guidelines, ("the Grids"), 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 203.29. (T. 25). If plaintiff had only physical impairments, the Grids would have dictated a finding of not disabled, based upon plaintiff's age, education, and prior work experience. Because plaintiff had additional non-exertional (mental) limitations, the Grids were used as a "framework," a basis from which the additional limitations were considered. (*Id.*)

## VI.   SEVERE IMPAIRMENT

### A.   Legal Standards

The claimant bears the burden of presenting evidence establishing severity at step two of the disability analysis. *Briggs v. Astrue*, No. 5:09–CV–1422 (FJS/VEB), 2011 WL 2669476, at *3 (N.D.N.Y. Mar. 4, 2011) (Rep.-Rec.), *adopted*, 2011 WL 2669463 (N.D.N.Y. July 7, 2011).   A severe impairment is one that significantly limits the plaintiff's physical and/or mental ability to do basic work activities.   *See* 20 C.F.R. § 404.1520(c); *see also* 20 C.F.R. § 404.1521(a) (noting that an impairment is not severe at step two if it does not significantly limit a claimant's ability to do basic work activities).

The Regulations define "basic work activities" as the "abilities and aptitudes necessary to do most jobs," examples of which include, (1) physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting.   20 C.F.R. § 404. 1521(b).   "Severity" is determined by the limitations imposed by an impairment, and not merely its by diagnosis.   The mere presence or diagnosis of a disease or impairment is not, by itself, sufficient to deem a condition severe. *Hamilton v. Astrue*, No. 12-CV-6291, 2013 WL 5474210, at *10 (W.D.N.Y. Sept. 30, 2013) (quoting *McConnell v. Astrue*, No. 6:03-CV-521, 2008 WL 833968, at *2 (N.D.N.Y. Mar. 27, 2008)).

An ALJ should make a finding of "'not severe' . . . if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'" *Rosario v. Apfel*, No. 97 CV 5759, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (quoting Social Security Ruling ("SSR") 85-28, 1985 WL 56856, at *3 (1985)).  Although an impairment may not be severe by itself, the ALJ must also consider "the possibility of several such impairments combining to produce a severe impairment . . . ."  SSR 85-28, 1985 WL 56856, at *3. However, a combination of "slight abnormalities," having no more a minimal effect on plaintiff's ability to work will not be considered severe. *Id.*  The ALJ must assess the impact of the combination of impairments, rather than assessing the contribution of each impairment to the restriction of activity separately, as if each impairment existed alone. *Id.*  The Second Circuit has held that the step two analysis "may do no more than screen out *de minimis* claims." *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995).  If the disability claim rises above a *de minimis* level, then the ALJ must undertake the remaining analysis of the claim at Step Three through Step Five. *Id.* at 1030.

Often, when there are multiple impairments, and the ALJ finds some, but not all of them severe, an error in the severity analysis at step two may be harmless because the ALJ continued with the sequential analysis and did not deny the claim based on the lack of a severe impairment alone. *Tryon v. Astrue*, No. 5:10-CV-537, 2012 WL 398952, at *3 (N.D.N.Y. Feb. 7, 2012) (citing *Kemp v. Commissioner of Soc. Sec.*, No. 7:10-CV-1244, 2011 WL 3876526, at *8 (N.D.N.Y. Aug. 11, 2011)).  This is particularly true because the regulations provide that combined effects of all impairments must be

considered, regardless of whether any impairment, if considered separately, would be of sufficient severity.  20 C.F.R. §§ 404.1523, 416.923; *Dixon*, 54 F.3d at 1031.

## B.    Application

Plaintiff argues that the ALJ erred in failing to find that plaintiff's thyroid impairment was severe.  Plaintiff was not denied benefits based upon the lack of a severe impairment, and the ALJ continued to address the subsequent steps, all the way to step five.  However, plaintiff argues that any error by the ALJ would not have been harmless because she failed to mention plaintiff's "non-severe" thyroid condition in combination with plaintiff's severe impairments at the subsequent steps of her analysis. The ALJ found that even though there was evidence that plaintiff either has or had problems with her thyroid, this condition caused only minimal effects on the plaintiff's ability to perform work. (T. 17).  The critical inquiry in a Social Security case is an analysis of the combined "effects" or functional limitations (whether physical or mental) that an impairment imposes or impairments impose on plaintiff's ability to work, regardless of the name of the impairment. *Dixon*, 54 F.3d at 1031.

Plaintiff argues that the "symptoms" of her hyperthyroidism include "feeling exhausted, insomnia, intolerance to heat, muscle weakness and nervousness, including anxiety with rapid heart rate." (Pl.'s Br. at 23) (citing T. 376, 407, 412, 419, 420, 447, 457; https://mayoclinic.org/diseases-conditions/hyperthyroidism/basics/symptoms/con-20020986).  There is no dispute that plaintiff has a thyroid impairment for which she is treated.  However, plaintiff was not diagnosed with the thyroid impairment until

February of 2014,[7] almost two years after her alleged onset date in September of 2012.[8] (T. 376).  Many of counsel's citations to the record are to the "presenting symptoms" on the first page of a multi-page medical report.[9]  Although plaintiff expressed the "symptoms" listed above at the beginning of the examination, in many cases, as discussed below, the physician's review of systems and physical examination notes show completely normal findings. (*Compare* T. 420 *with* 421-24).

On May 22, 2014, plaintiff was examined by Dr. Olayinka O. Wilhelm, M.D., who was treating plaintiff for her thyroid condition. (T. 413-17).  Plaintiff presented with a variety of symptoms, including dysphagia, fatigue, hoarseness, intolerance to heat, irregular menses, muscle weakness, nervousness, skin and nail changes, tremor, and weight loss.[10]  Plaintiff's medications and dosages were all reviewed by the doctor. (T. 414).  Notwithstanding the stated symptoms, Dr. Wilhelm's review of systems was

---

[7] A review of the February 13, 2014 report states under "History of Present Illness," that presenting symptoms include insomnia, intolerance to heat, nervousness, rapid heartbeat, skin and nail changes, tremor and weight gain. (T. 420).  However, the symptoms did **not** include dysphagia, **fatigue**, hoarseness, intolerance to cold, irregular menses, **muscle weakness**, and weight loss." (*Id.*) (emphasis added).

[8] Plaintiff was treated with radioiodine therapy on April 22, 2014. (T. 418).  The procedure involved administering an oral dose of radioisotope. (*Id.*)  Plaintiff was told that she would need to follow up with Dr. Wilhelm for administration of oral thyroid hormone supplementation, "which the patient understood she would need daily as a result of this treatment." (*Id.*)  Plaintiff was also told that she would follow up with Dr. Wilhelm for thyroid hormone level monitoring and for thyroid hormone replacement therapy. (*Id.*)  It is unclear why plaintiff told her primary care physician that Dr. Wilhelm told her to stop all of her medications.  Dr. Wilhelm's examination notes do not indicate that she had plaintiff stop her medications.  Dr. Wilhelm's notes generally review plaintiff's medications and indicate that she is taking them as directed.

[9] Plaintiff's counsel cites T. 376, 407, 412, 419, 420, 447, 457. (Pl.'s Br. at 23).

[10] Contrary to counsel's statement, presenting symptoms did **not** include rapid heart beat. (T. 413).  The presenting symptoms also did not include insomnia, intolerance to cold, or weight gain. (*Id.*)  Plaintiff did state that she had headaches, was very tired, and felt like she was in a "fog." (*Id.*)

completely negative for symptoms, including "generalized weakness, . . . goiter, . . . heat intolerance . . . dizziness, . . . focal weakness. . . headache . . . lightheadedness . . . memory impairment . . . decreased activity . . . fatigue . . . [and] irregular heartbeat/palpitations." (T. 415).  Plaintiff's physical examination resulted in normal findings. (T. 415-16). The report also indicates that all plaintiff's medications were continued. (T. 416).  On June 3, 2014, plaintiff's treating internist, Rekha S. Patel, M.D., noted that plaintiff reported that her therapist told her that "it is hard to differentiate if her [symptoms] are due to the current thyroid condition or the psychiatric illness." (T. 376).

On November 7, 2014, plaintiff indicated that she had increased anxiety due to various stressful issues in her and her family's lives. (T. 380).  Plaintiff was taking her thyroid medication and indicated that she felt better compared to the last visit. (*Id.*) Plaintiff stated that she was "feeling well." (T. 380).  The doctor noted that plaintiff was on Tramadol for her knee and noted that she was "taking her medication as prescribed." Plaintiff's restless leg syndrome was "well controlled with Neurontin." (*Id.*)  In the doctor's review of systems, plaintiff denied any symptoms whatsoever, including neurologic, psychiatric, and endocrine. (T. 382).

In the "objective" part of the November 7, 2014 examination, Dr. Patel stated that plaintiff appeared healthy and well-developed, and listed plaintiff's physical findings as normal. (T. 383).  Plaintiff was also alert and oriented, and although she displayed anxiety during the examination, her affect was appropriate, her speech was clear and fluent, her thought processes were coherent and logical, her memory was

intact, her judgment realistic, and her insight was appropriate.  There was no indication that her thyroid problem was causing any additional limitations on her ability to function. (T. 384).

In a report, dated February 13, 2015, plaintiff's "presenting symptoms" included "fatigue, insomnia, intolerance to heat and nervousness." (T. 407).  Once again, while plaintiff is correct that these symptoms, associated with her thyroid are listed on the first page of the report, the nurse's review of systems was completely "negative" for, inter alia, "chills/rigors, decreased activity, fatigue, and malaise." (T. 409).  The report also indicates that the nurse's review of systems was "negative" for endocrine symptoms such as "change in sleep/awake pattern, excessive diaphoresis,[11] goiter,[12] and polydipsia.[13]" (*Id.*) (individual footnotes added to quote).  Dr. Wilhelm's physical examination of plaintiff on the same day was completely normal. (T. 409-411).  Plaintiff's musculoskeletal and neurological examination resulted in normal findings, including a reference to plaintiff's knees as "normal." (T. 410).  Plaintiff's level of consciousness, her memory, and her motor functions were all normal. (*Id.*)

On November 19, 2015, Dr. Wilhelm noted "[p]resenting symptoms," under "History of Present Illness." (T. 447).  The symptoms include fatigue, insomnia, intolerance to heat, muscle weakness, nervousness, skin and nail changes, and weight

---

[11] Diaphoresis means sweating, usually as a symptom of disease or side effect of medication. https://medical-dictionary.thefreedictionary.com/diaphoresis.

[12] A goiter is an abnormal enlargement of the thyroid gland. https://www.mayoclinic.org/diseases-conditions/goiter/symptoms-causes/syc-20351829.

[13] Polydipsia is the medical term for excessive thirst. https://www.healthline.com/health/diabetes/polydipsia.

gain. (T. 447). The review of plaintiff's systems was "negative" for everything but "reproductive," because the doctor indicated that plaintiff was "post-menopausal." (T. 448). Pain was described as 0/10, and the report indicated that "[f]unctional status" had not changed. (T. 449). Plaintiff's physical examination was completely "normal." (T. 449). The normal findings included "regular [heart] rate," regular rhythm, and regular heart sounds." (T. 449).

Based on the plaintiff's medical reports, the ALJ's finding that plaintiff's thyroid impairment, in itself, was not severe is supported by substantial evidence. To the extent that plaintiff's thyroid problem contributed to her fatigue, her nervousness, her anxiety, her allegedly rapid heart rate, or her alleged inability to "get through the day," these symptoms were considered by the ALJ in conjunction with plaintiff's mental impairments which caused the same symptoms. The fact that the ALJ did not specifically mention plaintiff's thyroid impairment in the subsequent analysis is at worst, harmless error. *See Lowry v. Astrue*, 474 F. App'x 801, 805 (2d Cir. 2012) (where the rationale for the ALJ's decision was evident from review of the record, and where there was substantial evidence supporting the ALJ's decision, the ALJ was not required to discuss every piece of evidence found in the record).

The court makes the same finding with respect to plaintiff's knee impairment.[14] The reports do indicate that plaintiff has a degenerative condition in her knee, and the ALJ found that plaintiff's right knee arthritis was a severe impairment. (T. 17). In any

---

[14] In a footnote contained in her severity argument, plaintiff also argues that the ALJ failed to obtain a medical opinion concerning the limitations attributable to plaintiff's knee. (Pl.'s Br. at 24 fn.6).

event, the plaintiff's medical reports do not indicate that plaintiff's knee caused any functional limitations, beyond limiting her to medium work as found by the ALJ. In her applications for disability benefits, plaintiff did not list as disabling either her knee impairment or her thyroid impairment - which was not diagnosed at the time of her applications. Plaintiff listed only mental impairments in her applications for Social Security benefits.

It is the plaintiff's burden at step two to produce evidence showing that she has severe impairments. Although plaintiff's counsel argues that the ALJ should have obtained a "medical opinion" regarding the limitations imposed by plaintiff's knee, there was no evidence that such an opinion was necessary, given the multiple references in the record to normal findings in the knee. The ALJ did find that plaintiff's knee arthritis was a severe impairment, but did not find that the impairment limited plaintiff to less than medium work.

The court notes that most of the medical reports indicate that plaintiff's "pain" was "0/10," (See e.g. T. 449), and although some of the medical reports indicated that there was some limited range of motion in plaintiff's right knee (T. 444), there were other reports, showing that the examination of both knees was "normal" or "stable." (T. 384, 410). In fact, in reports dated November 7, 2014 and December 11, 2015, notwithstanding the diagnosis of "advanced R knee DJD," Dr. Patel noted that the knee was better with exercise. (T. 384, 440, 444). Dr. Patel recommended that plaintiff continue on her current diet and regular exercise regimen. (T. 444). Thus, the ALJ's finding at step two is not a basis for reversal or remand.

23

## VII.  RFC and WEIGHT OF THE EVIDENCE

### A.   Legal Standards

#### 1.    RFC

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ."  A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R. §§ 404.1545, 416.945.  *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)).  An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities.  *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460 (W.D.N.Y. 1987)).  The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence.  *Trail v. Astrue*, No. 5:09-CV-1120, 2010 WL

3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7).

### 2.    Treating Physician

"Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, . . . the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record . . . ." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  The ALJ must properly analyze the reasons that a report of a treating physician is rejected.  *Halloran,* 362 F.3d at 32-33.  An ALJ may not arbitrarily substitute his own judgment for competent medical opinion.  *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

### 3. Weight of the Evidence

In making her determination, the ALJ weighs all the evidence of record and carefully considers medical source opinions about any issue. SSR 96-5p, 1996 WL 374183, at *2-3 (1996).  Under 20 C.F.R. §§ 404.1527(e) and 416.927(e), some issues are not "medical issues," but are "administrative findings."  The responsibility for determining these issues belongs to the Commissioner. SSR 96-5p, 1996 WL 374183, at *2.  These issues include whether the plaintiff's impairments meet or equal a listed impairment; the plaintiff's RFC; how the vocational factors apply; and whether the plaintiff is "disabled" under the Act. *Id.*  In evaluating medical opinions on issues that are reserved to the Commissioner, the ALJ must apply the factors listed in 20 C.F.R.

§§ 404.1527(d) and 416.927(d).  The ALJ must clearly state the legal rules that he applies and the weight that he accords the evidence considered. *Drysdale v. Colvin*, No. 14-CV-722, 2015 WL 3776382, at *2 (S.D.N.Y. June 16, 2015) (citing *Rivera v. Astrue*, No. 10 Civ. 4324, 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) (citation omitted)).

### B.    Application

Two of plaintiff's issues are appropriately analyzed in this section.  Plaintiff argues that the ALJ did not properly consider the medical sources' finding that plaintiff would be off-task more than 33% of the time and would be absent more than three days per month. (Pl.'s Br. at 11-22).  Plaintiff states that the VE testified that a 10% reduction in the ability to stay on task, combined with only one unexcused absence per month would eliminate all jobs. (Pl.' Br at 11) (citing T. 455).  Plaintiff also argues that, in making her RFC determination, the ALJ failed to properly weigh the medical opinions of record. This court does not agree.

On December 24, 2013, Dr. Undavia completed a "questionnaire," in which he stated that plaintiff's diagnosis was ADHD, Personality Disorder, and Paranoia. (T. 334).  Dr. Undavia stated that plaintiff was abrupt, rude, and at times, too bold/rude. (*Id.*)  Plaintiff offended people when she spoke, and she had difficulty getting along with others. (T. 335-36).  Dr. Undavia related plaintiff's experience at the Salvation Army, during which she was rude to a supervisor in speaking out about the supervisor's alleged nepotism. (T. 336).  Dr. Undavia stated that plaintiff's clinical course was "quite stormy," that she could not get along with fellow workers," and that she "always

loses [the] job." (*Id.*)  The questionnaire asked about plaintiff's attitude, appearance, and behavior, to which Dr. Undavia responded that plaintiff never finds fault with herself, and that she is always clean. (T. 337).  Her speech is normal, and she finds fault "in the system."  Her mood and affect were anxious, but not depressed, and her affect was "adequate/appropriate." (*Id.*)  Her sensorium is listed as "clear," and her intellectual functions "average."  Her attention and concentration is listed as "poor," her orientation was "X4," her memory was "poor for short term events," but "normal" for remote events.  Dr. Undavia listed plaintiff's information as "poor," and her ability to perform calculations as "poor."  Next to "insight and judgment," Dr. Undavia appears to write that plaintiff has no insight into how rude she becomes.  She believes that she is too truthful and honest, but not sensitive to the fact that she is often rude and abrupt. (*Id.*)

Dr. Undavia's answers do not always follow the questions. (T. 338).  In response to a question about activities of daily living, asking the writer to describe how the plaintiff spends a full day, Dr. Undavia stated only "Can do many job [sic] just can't hold job." (*Id.*)  The doctor also states that plaintiff has tried many jobs, but has failed to keep them.  In response to a question about plaintiff's ability to do work related mental activities, Dr. Undavia wrote: "only limited; job that she can't sustain leads to poor self esteem frustration/ despair/ anger." (*Id.*)  The questionnaire also has a section in which the writer is asked to assess the plaintiff's understanding and memory, sustained concentration and persistence, social interaction, and adaption. (T. 339).  Dr. Undavia has checked boxes stating that plaintiff is "limited" in all categories, but has

failed to explain any of them,[15] except for "social interaction" under which the doctor wrote simply: "poor." (*Id.*)

On August 9, 2015, Dr. Undavia completed another questionnaire, in which he noted that the limitation on plaintiff's ability to maintain attention and concentration was "medium to marked;" the limitation on her ability to perform activities within a schedule, and maintain regular attendance was "medium;" the limitation on her ability to complete a normal work day without psychological interruptions and perform at a consistent pace was "marked," as were the limitations on her ability to accept instructions, get along with co-workers, and respond appropriately to ordinary stresses in the work place with simple tasks. (T. 370). Dr. Undavia indicated that the limitation on plaintiff's ability to interact with the general public was "extreme." (*Id.*)

Dr. Undavia indicated that plaintiff would be "off task" "more than 33% of the day, and would be absent 3 or more days per month. (T. 371). When asked to state the "diagnoses" upon which the doctor's answers were based, he stated "Irritability, fighting with others, paranoid, can't focus, frequently gets fired from jobs." (*Id.*)

The ALJ gave Dr. Undavia "significant" weight, to the extent that his opinions were supported by the record, but found that his "extreme limitations" were not justified in light of the plaintiff's activities, which included living alone, driving, babysitting her two-year-old nephew, working with her therapist to achieve her goal of establishing romantic relationships with men, talking to friends on the telephone and attending appointments regularly. (T. 22). The ALJ did find "marked" limitations on

---

[15] An explanation is requested by the form. (T. 339).

plaintiff's social domain as a whole, and considered those limitations in formulating plaintiff's RFC. (*Id.*)

Dr. Cole, also completed a questionnaire on August 31, 2015, stating that plaintiff would be "off-task" more than 33% of the day and absent three or more days per month. (Pl.'s Br. at 12) (T. 404-408).  Plaintiff argues Dr. Cole's opinion is consistent with Dr. Cheryl Loomis, Ph.D., the consultative examining psychologist who found marked impairment in plaintiff's ability to maintain a regular schedule.  Plaintiff argues that even the non-examining psychiatrist, Dr. Kleinerman agreed that plaintiff's ability to work consistently was diminished, noting a "moderate" limitation in her ability to complete a normal work day without interruptions from psychiatric issues and maintain regular attendance. (Pl.'s Br. at 13).

The problem with the questionnaires completed by Dr. Undavia and Dr. Cole is that they are inconsistent with their own treatment notes and with the plaintiff's activities in general.  Dr. Undavia marked boxes on his December 24, 2013 questionnaire, indicating that plaintiff's understanding and memory, concentration and persistence, social interaction, and adaption were all "limited," but failed to comply with the request on the form to "please describe below." (T. 339).  The only "explanation," was written under "social interaction."  Dr. Undavia simply wrote: "poor." (*Id.*)  In his August 2015 questionnaire, Dr. Undavia did not explain his conclusory opinion that plaintiff would be "off task" for more than 33% of the day and would be absent from work for three or more days per month. (T. 371).

In several of Dr. Undavia's treatment notes, he notes that plaintiff has problems

with being rude or abrupt, and that is why she has trouble getting or keeping a job.  He never commented on plaintiff's memory or attention until October 13, 2015, when he stated that because plaintiff did not recall what they spoke about in the past, this suggested "some memory gaps[,] rather hyperarousal state, agitation, and anxiety." (*Compare* T. 312, 314, 316, 360, 361 *with* 294).

In contrast, on July 18, 2013, Dr. Undavia stated that plaintiff's "[o]rientation, memory, concentration, and attention span have improved." (T. 315).  In the same report, Dr. Undavia stated that plaintiff's stream of mental activity was "quite normal, spontaneous, lucid, and coherent." (*Id.*)  Her mood was "anxious," but she and the doctor discussed her personal relationships. (*Id.*)  On March 4, 2014, Dr. Undavia wrote a report, stating that plaintiff's memory and attention were "normal." (T. 361).  On November 24, 2014, Dr. Undavia noted that plaintiff's mood was anxious, but she was not depressed or suicidal, and her orientation and memory were "good."[16] (T. 365).  On December 31, 2014,[17] April 14, 2015, and July 14, 2015, Dr. Undavia stated that plaintiff's orientation and memory were "normal" or "good." (T. 366, 367, 368).  On April 14, 2014, Dr. Undavia stated that plaintiff's affect was adequate and appropriate, and they discussed Medicaid, insurance, and liability. (T. 367).

Dr. Cole's opinion regarding such extreme limitations to being on task is inconsistent with a letter that he wrote to the public defender in support of keeping

---

[16] In the same report, Dr. Undavia stated that plaintiff's affect was "inadequate, but appropriate," her eye contact was good, her stream of mental activity was "very spontaneous, lucid, and coherent," and there was no formal thought disorder. (T. 365).

[17] On December 31, 2014, the doctor also stated that plaintiff would not "open, all that she wants is the medication." (T. 366).

plaintiff out of jail after she had some legal issues. (T. 349-52). Dr. Cole's letter was dated January 14, 2014, and coincidentally was written on the same day as Dr. Loomis's consultative evaluation. (T. 341-45). Dr. Cole discussed plaintiff's many psychological issues, but stated that she had begun to "make progress in her psychotherapy and was looking for gainful employment." (T. 350). Dr. Cole also stated that plaintiff put forth "a great deal of effort" in this endeavor. (*Id.*) She had found a job working in a supportive shelter for women, and she was very excited about obtaining the job. According to Dr. Cole, the only reason that she left the job was that someone confronted her about her criminal background, resulting in her suspension from the job. There was no indication that plaintiff was not performing the work. In his 2014 letter, Dr. Cole also stated that plaintiff had made "great progress in developing her housecleaning business and [was] very well-liked and trusted by the people for whom she provides housecleaning services." (T. 351). Dr. Cole suggested that the best thing for plaintiff was to remain free in the community so she could continue to work on her psychotherapy, continue to develop her ability to address and process her emotional and relational needs . . . and where she can continue to develop and build her cleaning service career which [is] increasingly valued in the community." (*Id.*)

However, in an letter dated January 17, 2016, Dr. Cole stated that plaintiff never worked full-time, and that she lost her pharmacy job because she was very slow and took an inordinate amount of time to complete tasks, her inability to stay on task, her inability to get along with co-workers, and her inability to cope with the pressures of

managerial oversight. (T. 476, 467).

In her consultative opinion, Dr. Loomis stated on one page, that plaintiff's attention and concentration was "mildly impaired, most likely due to overall inattention." (T. 343). However, in her summary, Dr. Loomis stated that plaintiff exhibited "moderate" in her ability to maintain attention and concentration. (T. 344). The ability to stay on task is a function of attention and concentration, so it is unclear how Dr. Loomis's finding that plaintiff's attention and concentration were only mildly impaired or even moderately impaired supports Dr. Cole's questionnaire finding that plaintiff would be "off-task" 33% of the time.

Although Dr. Loomis stated that plaintiff exhibited a "marked" impairment in her ability to maintain a regular schedule, it is unclear from her report upon what she based her determination. In his January 17, 2016 letter, Dr. Cole commented that plaintiff met with him on seven occasions, "was on time for her sessions," and "participated actively in the psychotherapy process." (T. 476). In fact, Dr. Cole stated that plaintiff had participated "consistently" in her psychotherapy for over 2 ½ years, even though she was just reaching the point when she could begin to explore and engage in her relationship on a more meaningful level. (T. 477).

The ALJ cited the report authored by State Agency Review "psychiatrist," Dr. G. Kleinerman, who did not examine the plaintiff. (T. 23). The ALJ gave Dr. Kleinerman's report "partial weight." (*Id.*) Dr. Kleinerman opined that plaintiff was capable of performing a job with simple tasks in a low contact environment. (*Id.*) The record contains a list of what Dr. Kleinerman considered, together with a summary,

together with a "summary" of Dr. Loomis's consultative report. (T. 92-93).  Dr. Kleinerman then assessed plaintiff's limitations in a mental RFC assessment. (T. 96-98).

Dr. Kleinerman also noted that Dr. Loomis's opinion was more restrictive than his.  Dr. Kleinerman explained the reason for his difference of opinion, noting that Dr. Loomis's opinion appeared to be based solely on plaintiff's subjective statements and was not supported by the "totality of the evidence." (T. 99).  Dr. Kleinerman stated that Dr. Loomis's opinion was an "overestimate of the severity of the individual's restrictions/limitations and based only on a snapshot of the individual's functioning." (*Id.*)  The opinions of non-examining sources may override treating sources when they are supported by evidence in the record. *Smith v. Berryhill*, 2018 WL 3202766 at *4 (citing *Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995)).  The ALJ in this case carefully considered all the evidence in making her determination of plaintiff's RFC.

The plaintiff's primary care providers, although not specialists in psychiatry or psychology, consistently noted that plaintiff's psychiatric examinations were "normal." (T. 423).  Progress notes from Dr. Wilhelm, dated February 13, 2014 state that plaintiff's memory was normal; she had no agitation, nor was she anxious; her behavior was appropriate; she exhibited no compulsive behavior, no memory loss, no mood swings, or obsessive thoughts; she had normal attention span and concentration; and displayed no pressured speech. (T. 423).  On February 13, 2015, Dr. Wilhelm also stated that plaintiff's memory was "normal." (T. 410).

Dr. Rekha Patel, M.D. consistently reported that plaintiff denied psychiatric

symptoms. (T. 319, 326, 382, 442).  Dr. Patel found that plaintiff's affect was appropriate, her thought processes were coherent and logical, she was alert, her memory was intact, her judgment realistic, and her insight appropriate. (T. 320, 328, 374, 377, 383, 436, 444).  Her attention span and concentration were normal. (T. 423).  On September 4, 2015, Dr. Patel reported that plaintiff's mood was normal, her affect was appropriate to her mood, she was coherent and logical, alert and oriented, her memory was intact, her judgment was realistic, and her insight was appropriate. (T. 436).

In December of 2015, plaintiff did display anxiety during an examination by Dr. Patel because she was upset that Dr. Undavia was no longer accepting her insurance, and she was concerned about what she was going to do. (T. 444).  However, the doctor noted that her affect was appropriate, her speech was clear and fluent, her thought processes were coherent and logical, she was alert and oriented, her memory was intact, her judgment realistic, and her insight was appropriate. (T. 444).

It was the province of the ALJ to resolve the conflicts in the evidence and to determine plaintiff's RFC based on the evidence. *Anselm v. Commissioner*, No. 17-2948, __ F. App'x __, 2018 WL 2901334, at *3 (2d Cir. June 11, 2018) (citing inter alia *Veino v. Barnhart*, 312 F.3d at 588-89; *Mongeur*, 722 F.2d at 1038).  The court defers to such resolution. *Id.* (citation omitted).  Although plaintiff's counsel argues that the ALJ did not properly weigh the treating providers' reports, this court does not agree.  The ALJ found significant limitations in plaintiff's mental abilities and incorporated them into the RFC.  The ALJ accepted some of the opinions of plaintiff's treating mental health professionals, but rejected the conclusory opinions that were

34

excessively restrictive compared to their treatment notes and the plaintiff's daily
activities.  The ALJ's decision is not required to perfectly correspond with any of the
opinions of medical sources cited in his decision, and she may accept portions of the
medical records while rejecting others in order to make an RFC determination that is
"consistent with the record as a whole." *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir.
2013),

The Second Circuit has recently made it clear that the ALJ need not afford
controlling weight to the opinions of a plaintiff's treating physicians when they are not
supported by clinical findings and inconsistent with their own records and treatment
notes. *Smith v. Berryhill*, No. 17-2005, __ F. App'x __, 2018 WL 3202766, at *2 (2d
Cir. June 29, 2018).  The ALJ must give "'good reasons'" for affording the limited
weight. *Id.* (quoting *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998); 20 C.F.R. §
404.1527(c) (2)).  In *Smith*, the ALJ gave less weight to the opinions of three treating
physicians who completed questionnaires, in which they checked boxes, indicating that
the plaintiff would be "off-task" various percentages of the day or absent from work for
various days during the month. *Id.* at *2.  The court also stated that the ALJ was not
required to identify the evidence explicitly rebutting the opinions of Smith's treating
physicians before discounting or rejecting them." *Id.* at *4 (citing *Halloran v. Barnhart*,
362 F.3d 28, 32 (2d Cir. 2004)).

In this case, Dr. Undavia's responses to the questionnaires contradicted the
findings in his treatment records, and Dr. Cole's questionnaire responses were
contradictory to at least one of the letters that he wrote on behalf of the plaintiff.  These

contradictory reports gave the ALJ concern that Dr. Cole advocated "for whatever the claimant requests." (T. 22). The ALJ specified the parts of Dr. Cole's letter that she believed were contradictory and thus, supported her decision to give Dr. Cole's limitations "some weight." (T. 22-23). The ALJ found that although plaintiff had "marked" limitations in some areas, Dr. Cole's finding of "extreme" limitations were not supported by the record. (T. 23).

## VIII. <u>STEP FIVE DETERMINATION</u>

### A. **Legal Standard**

At step five of the disability analysis, the burden shifts to the ALJ to demonstrate that there is other work in the national economy that plaintiff can perform. *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009). If the ALJ utilizes a VE at the hearing, the VE is generally questioned using a hypothetical question that incorporates plaintiff's limitations. *See Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981). Although the ALJ is initially responsible for determining the claimant's capabilities based on all the evidence, *see Dumas v. Schweiker*, 712 F.2d 1545, 1554 n.4 (2d Cir. 1983), a hypothetical question that does not present the full extent of a claimant's impairments cannot provide a sound basis for vocational expert testimony. *See De Leon v. Sec'y of Health and Human Servs.*, 734 F.2d 930, 936 (2d Cir. 1984); *Lugo v. Chater*, 932 F. Supp. 497, 503-04 (S.D.N.Y. 1996). Conversely, the ALJ may rely on a VE's testimony regarding the availability of work as long as the hypothetical facts the expert is asked to consider are based on substantial evidence and accurately reflect the plaintiff's limitations. *Calabrese v. Astrue*, 358 F. App'x 274, 276 (2d Cir. 2009).

Where the hypothetical is based on an RFC analysis supported by substantial facts, the hypothetical is proper. *Id*. at 276-277.

### B.   Analysis

The VE asked the ALJ a hypothetical question and then "expanded" the question to include an additional limitation. (T. 52-53).  The expanded question mirrored the ALJ's RFC determination.  The ALJ's hypothetical accounted for all of the limitations on plaintiff's mental functioning that were supported by the evidence in the record. (*Id.*)  The VE opined that there would be jobs available for plaintiff in the national economy.  Plaintiff's counsel questioned the VE about plaintiff's alleged inability to stay "on task," her alleged periodic absences from work, her alleged inability to complete a normal work day without psychologically based interruptions, and her alleged inability to keep a regular schedule. (T. 54-56).  The VE stated that those additional restrictions would preclude any work in the "general labor market." (T. 56).

The ALJ relied on the VE's testimony at step five, without the additional limitations proposed by plaintiff's attorney. (T. 25).  Because this court has found that the ALJ's RFC determination was supported by substantial evidence, and the ALJ properly rejected the additional limitations, it also finds that the ALJ's determination at step five, and the ultimate determination of disability, were similarly supported by substantial evidence.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the Commissioner's decision is **AFFIRMED**, and plaintiff's complaint is **DISMISSED**, and it is

**ORDERED**, that judgment be entered for the **DEFENDANT.**

Dated: August 7, 2018

Hon. Andrew T. Baxter
U.S. Magistrate Judge